All right. Our third case for this morning is Katrina Bragg against Munster Medical Research Foundation and others, 212913. We'll let counsel get up to the table. When you're ready, Ms. Stauff, we will start with you. Good morning. May it please the Court that the case before this Court is an employment discrimination case alleging race discrimination and retaliation for protected activity under Title VII of the Civil Rights Act of 1964. We are here on Ms. Bragg's appeal of the lower court's granting of summary judgment in community hospitals' favor. Ms. Bragg is an African American registered nurse. Community hospital staff is overwhelmingly white. There was just one black RN employed in Ms. Bragg's unit while she was there. Everyone else was white, but for one Latino registered nurse. The facts at issue in today's appeal span just 10 weeks. This was Ms. Bragg's first position as an RN after graduating with her bachelor's degree in nursing. At community hospital, the procedure is much like it is at other hospitals where new RNs go through a 90-day training program and work with a preceptor, another RN, who trains this new RN, teaches hospital procedure, evaluates the new RN's performance. After 90 days, the new RN is then no longer shadowing the preceptor and instead continues usually to work in the same department in which they were hired. The problems that led to this case and are leading to this appeal began on Ms. Bragg's first day on the patient floor. Ms. Bragg noticed that she, and I should note that she had, was assigned a white preceptor. She noticed that she was assigned black or Latino patients while the white preceptor kept the white patients. Ms. Staff, we have read the briefs very carefully and are aware of the facts. I'd like to jump in right there since you mentioned the word preceptor. What type of relationship between the three preceptors, Wysocki, Arrigo, and Raditz, does the record establish that these three preceptors had? And then as a corollary, what type of relationship did those preceptors have with the two administrators, Krantz and Meyer, who were responsible for the ultimate adverse employment action here? So you're asking are they the preceptor's supervisory? No, I'm asking does the record tell us what type of relationships did the preceptors have together? Did they talk? How small was the staff? She has these three separate experiences with the preceptors. And part of your theory is that their racial bias, their racial animus, influenced their poor performance reviews, which then influenced her ultimate transfer in lieu of termination. Yes. Okay? So I'm trying to understand how the record helps us draw this line, make this clear. Were they talking when she complained about Wysocki's behavior the first week? Did the other preceptors find out? Do they talk in the hallways? Have they all worked there together a long time? Do we know any of that from the record? Yes, I believe we know from Ms. Bragg's deposition testimony that certainly the, so we had three preceptors, so that Ms. Arrigo was the middle one, and that she and Ms. Raditz worked closely together, and there are numerous incidents throughout the record where they're kind of overlapping. All of the, I believe the record shows quite clearly, mostly in passing, that this is one unit of RNs. They're all peers, actually. So, and that's why I asked about the supervisory distinction, because the truth is is that once that 90 days expires, these RNs would all be peers, even the new one, to them. So it's not a huge department. This was for South Renal. I know there's somewhere in the record it talks about numbers, and I apologize for not putting that forward. Yeah, I actually had a question for you about that, because I'm trying to make sense of this assignment issue with Wysocki that we begin with, although it does seem that Munster tries to fix that right away by taking Wysocki off the case, but do we know anything about patient population? Do we know anything that would allow us to have some perspective over how many people there are? Because we're dealing with such small numbers. We're dealing with a couple of people assigned to A and a couple of other people assigned to B, and without knowing what the big picture looks like, it's hard to make sense of that. What we do know is that the preceptor-trainee pairs were generally assigned four to five patients apiece. Was the patient population 80% non-minority? Was it 80% minority? Was it something else? Do we know anything about the pool that they were selecting from? No, we do not have the numbers for the overall pool, but what we have are Ms. Bragg's observations about who she was treating. The procedure was when everyone came into work, the nurse manager would put a list up, and then the preceptors would pick who they wanted, which patients they wanted, and then the trainees would be assigned patients within that little group. Yes, so while there are no numbers on the overall population, we have Ms. Bragg's observations, which are the first few days, she complained, and then it balanced out. And then they get rid of Vaisakhi, and Arrigo comes in. Different issues with Arrigo, I certainly understand, the music and all the rest of that, but actually quite significantly different it seems to me from racially conscious patient assignment. Absolutely. It is a different tone, and it is a different atmospheric change, but it's and what I would argue is that this is, these are still, these are decidedly ambiguous comments, but they are racially tinged in different contexts, and Ms. Bragg objects to these things in time right there. And so that certainly put them on notice that she had problems with the way they were behaving. Can you go back to my other question about the relationship between the preceptors and then these two, the nurse manager and the administrator, Krantz and Meyer, who make the ultimate decisions? There, I felt, was an important piece of evidence in the record where we do have Raddatz saying, this is Krantz, she's my best friend, she'll do anything for me. Is there anything else in the record that you want to point us to this morning about the relationship between the preceptors and Krantz and Meyer that would help us to side with your argument that a jury can infer that these preceptors had influence over Krantz and Meyer's decisions? There were, in the record there are meetings, there were the weekly meetings that were often attended by more than one of the preceptors. You can see this in the evaluations. And also the critical person for the weekly evaluation was not Meyer, it was Dan Heredia, who was the educator RN. And he was kind of the center point for all of this. They all, the preceptors all talked to him and conferred with him about how they felt Ms. Bragg was doing and that formed his opinion. But none of the, one of the key things is that none of these people saw, so only the preceptors ever saw Ms. Bragg perform her duties as a nurse. And did they talk to Mr. Heredia independently before those weekly meetings? Yes, I believe so. I mean, yeah, and I can't off the top of my head. I wasn't clear on that from the record. I'm sorry. Yeah, well they were presenting, they were presenting their reports to Mr. Heredia, who was then writing up minutes. The last half, last month of her employment, these evaluations, she never saw it by the way, these were, I believe, write-ups from Mr. Heredia. And they had clearly all talked. There was a meeting too, where some of these topics would be raised. But there's nothing inherently wrong with that, it seems to me. This is a probationary employee. And what concerns me is that you're swimming upstream in a way because her overall ratings are really quite low on this scale of 25. It's 12, it's 14. And so, you know, you have to cast quite a bit of shadow on the legitimacy of these ratings. And I don't know quite how you do that. And I certainly don't know why that means that Mr. Heredia is a tainted decision maker. Because he only gets his information through these three preceptors one by one. And two of them she ranks actually quite highly. She indicates she enjoys working with them. If I may on that, those were, they had more regular little slips that they kind of filled out on that day-to-day. This is directly addressed in the deposition where she's asked, does this reflect your overall experience? And she says, no, if you would ask me, this doesn't show all of them, if you would ask me every single day, I would be writing down what happened that day. It so happened the ones that are in evidence are the ones where it was a good day. And so the, I lost my train of thought on the first part of what you said, Judge, I'm so sorry. But the larger issue, I mean, there's, the ratings are all subjective. And so we see these ratings based on, on falsehoods to begin with. And in the record, and this is detailed in Ms. Bragg's affidavit, this is also detailed in the, our statement of genuine facts for the summary judgment. Very specific citations to personal knowledge, observations. And so to the extent that hours of Ms. Bragg's depositions were spent walking through every single one of these things, it's a lot more than the usual denial. We're all used to seeing that in these kinds of cases where the employer says the, you know, plaintiff is a terrible employee, I mean. Well, there were a lot of problems that the, that Munster points out that don't really go to the points that you're making, whether it's dealing with the medical record system or the time system or things that don't seem to have anything to do with IVs or with horrible jokes about, whatever I can call it, about oxygen lines. There, there are a lot of just standalone critiques. And I, I would remind you of all that the, this was a training period of learning the system. So now this is a brand new RN coming into the hospital. But there were other people learning the system too. And the, the white woman is not invited to stay on. Two other black women are. And what do we take from this? I think we can take from this that the actual scoring, so that number system, is extremely subjective. And it was in their interest after the very first day, the point of this is that Ms. Bragg contested this behavior second or third day of work, before her very first evaluation was ever written. And if we actually compare her to the, there was a subsequent employee, Mary Anderson, a white new RN, who, who was hired and then did not survive her orientation period after Ms. Bragg. The scores are actually a little bit higher. But when you look at what she's accused of, she's fighting with them when they're trying to tell her to keep better track of her time and whatnot, like this really disagreeable employee, compared to Ms. Bragg, where lower scores for she's trying and she's, you know, blah, blah, blah, she's working hard, even through some of the end stuff, they're still saying that. So I would say that the scoring, this, this goes to show the scoring is subjective. Of course, there's nothing illegal about that. There is nothing illegal about that, except that when it's set off by someone who from day one says, this is discriminatory. That's what she's saying is it's a racist environment. I understand that. She, that's how she, well, and then ultimately retaliatory. I'd like to reserve my time. All right, Mr. Doherty. Thank you, Your Honor. May it please the Court. I'll first address the issues that the Court raised in their argument. The first one deals with the preceptor, Ms. Wysocki, and the allegation of race-matching patients. There is no evidence in the record to reflect percentage of patients in the department. Ms. Wysocki in her affidavit has confirmed that she does not assign patients on the basis of the race of the nurse or of the patients. And we're talking about the first two patients for the first five days. But are we required to take her word for that? If it appears that the patients have been assigned on a racially obvious basis? Ms. Wysocki verifies in her affidavit that they were not assigned on that basis. There was an inference that was fixed by taking Ms. Wysocki off the case. In fact, preceptors are consecutive, the first, second, and third. The record reflects that she was preparing for a wedding. She was not taken off the case. That was her normal assignment. Plaintiff also indicates that Ms. Wysocki in those first few days took a white patient from her. But the fact is that Ms. Bright could not recall the medical condition of that patient, did not know the treatment for that patient, and Ms. Wysocki's prerogative to select a patient is entirely hers. The other question that was asked relates to the preceptor relationships. These are the supervision of Krantz, who is the manager of the department. Myers is the director of nursing, director of all nurses. That essentially is the relationship. Another question that was posed is the status of Dan Heredia. He is a registered nurse, but he is in the education department. This is reflected in the record. As educator, he assists in this process and assists the preceptors. None of the preceptors or Mr. Heredia have management or supervisory authority over Ms. Bright. They are, in fact, hourly employees. But the theory is this cat's paw theory, that they are the ones with the bias and they are manipulating the people who do have that higher fire, finish probation power. Yes, that's the theory, non-management preceptors in a scheme to dupe Krantz and Meyer into firing Ms. Bragg. But there has to be more than just that statement. It has to be based upon a discriminatory animus, based upon Ms. Bragg's race. Ms. Bragg presents a litany of events that, according to her, and if you believe her, would be deemed as harsh, inappropriate, unfair, rude. But she does not connect those events to her race. Is that true for the hip-hop music? I think she definitely did, or the insensitive remark about the amputee. I mean, it seems like there are plenty of things connected to race. Well, in respect to the rap music, Ms. Bragg indicates that she does not know what music was played. She has no idea what music Ms. Arago plays when she's not present. So you would just say that's hearsay, because there is actually some discussion in the record about that, that she goes to pop and country and other formats. It seems to me, even in your statement of facts, you identify even more disputes than Ms. Bragg. And so that's one of our fundamental questions. Do we have material disputes of fact here that really need to go to a jury? Not disputes of fact that are material, Your evidence as to what music Ms. Arago played at other times. In respect to the purported statement when an oxygen cord was wrapped around a patient's neck, whoa, let's not have a hanging tonight. Well, Raddatz confirmed that she does not believe that she made this statement, and she certainly wouldn't have made this statement. But we have to assume she did. And we're assuming that she did. But Ms. Bragg admits that Ms. Raddatz did not mention or make any reference to her race or the patient's race when he made this statement. That's never been our standard, though, that you must have a direct statement. Well, the statement alone does not necessarily reflect racial discrimination. But the patient was a minority person, right? That is correct. But it was not stated in front of the patient. Mr. Daugherty, I think I get where you're going. And you're saying if you slice this up, you don't see the connections. And you would ask us not to see any as well on this record. Let me ask you about the review process. One of the things that struck me is the allegation that she did not participate in the end in signing off on any of the memos as she did in the beginning. So I'm just wondering if you could walk me through that review process of her performance at the end of her 10 weeks there. Was she not present at these last several meetings? Or did she just not sign off on the overall summary memo per custom as she did at the beginning? And how do we know if she wasn't present at the meetings, or if she was but didn't sign off on these memos, how do we know whether or not she contested the assessment of her performance at the time? We know right now in this litigation, she has a dispute about whether her performance was poor. But how do we know without her actually at the meetings or signing off on those memos what her position was at the time? There were a total of six meetings from October 1 through November 26. All the attendees at the meeting verified in their affidavits that Ms. Bragg was present at each and every meeting. Ms. Bragg does not dispute her attendance at those meetings. There is no set policy. She did sign the meeting report on the first one. She did not sign the other ones. But there is no dispute that Ms. Bragg was present. And each and every attendee at the meeting verified that the statements made, the level of her performance, and the people attended are correct in those meeting minutes. So when did she see the meeting minutes for the latter meetings? It's my understanding from the record, she only saw those in litigation. That's her claim and that's what is on the record. We have no way of verifying when she saw them. But you're saying that there's at least evidence that she was in the room. There was evidence that she had... There's the write-up and then there's the are you in the room. A little different. Attended the entire meeting. Also the meeting minutes reflect that all these issues were discussed. Ms. Kranz attended five of these meetings. Ms. Myers personally attended three of these meetings. And the preceptors and Mr. Heredia is noted at the meetings. There's no question that she attended every meeting. And verification from the preceptors, Ms. Kranz and Mr. Heredia, and also Ms. Meyer, that the content of the meeting, statements made, the performance, her level of performance was accurate and was true. Now why did she sign off on the first one but not the others? Is it custom for the orientee nurse to sign off on these meeting memories? It depends on when they're prepared. Mr. Heredia prepares the minutes, takes the minutes of the meeting and prepares a document. It's just a matter of record-keeping as far as did it get to Ms. Bragg? Did she sign it? Did she return it? It's not a requirement. It's not in any policy. Let me ask you a different question. One of the arguments that Ms. Bragg makes is that if she was really all that terrible, why did they just move her across the street to Hartsfield? And why further did they say, you know the job well enough even though she was doing functionally the same things at Hartsfield that she had been asked to do at the renal unit? And isn't this a sign that the reasons for letting her go were not genuine reasons but in fact pretextual? The bottom line is that they terminated her employment at community hospital. But it's all one big happy family, right? I mean Munster owns Hartsfield, right? It's part of the same system. That's what I'm saying. Hartsfield is a retirement home. She was working in an acute care department in the hospital. Ms. Meyer and Ms. Krantz in addition to making the decision for termination indicated that she could transfer to Hartsfield where Ms. Meyer and Krantz had verified that they believed it was a slower, less demanding environment where Ms. Bragg could have an easier time in terms of her transition. But don't we have a dispute of material fact there too? Because Ms. Bragg is saying I had more patients at Hartsfield. They were older. They were sicker. I had more responsibilities. That stands in direct contrast to what Krantz and Meyer have testified about what they thought she'd be doing over there. I would not agree, Your Honor, that it's a material fact. We don't even get to the point where we can demonstrate a discriminatory animus based upon Ms. Bragg's race as related to the termination. The record strikes me as very thin about the comparison between Munster's renal unit and the Hartsfield unit that she gets sent to. Without knowing anything about it, maybe an acute care center has certain requirements and a long-term facility has different requirements, but we're not allowed to decide these things on the basis of speculation. There needs to be evidence in the record and it seems that she's given a very responsible position at Hartsfield. She was nevertheless terminated by Krantz and Meyer who are, as noted in the record, strictly a manager and director of Community Hospital. In fact, they allowed her to transfer over to Hartsfield I don't believe is a material fact that has any relevance. Why doesn't that indicate confidence in her ability to do the work? Why doesn't it indicate something? When people give shifting and contradictory explanations for what they're doing, that can be understood by a jury as evidence of a pretextual statement that maybe it wasn't her skills as a nurse after all it's just that she was persistent when she saw racist problems in the workplace to bring them to the attention of people. I don't believe it demonstrates confidence in her work. It demonstrates the fact that they terminated her and put her into another facility where she would again have to go through an orientation process. But she says it's only two weeks. And of course we can't dispute that based upon the evidence. That's right. As stated, I don't believe that it's a material fact. Miners and Krantz have rendered the opinion they believe that Hartsfield was a slower, simpler environment and they allowed her to transfer to that facility. They can't force her to do so. But they clearly terminated her from community hospital based on legitimate reasons. I think the ultimate question is whether a reasonable jury could find prohibited conduct in this case. And defendant has set forth through admissible evidence legitimate and non-discriminatory reasons for the termination of plaintiff's employment. And defendant has not established that has not been established that those reasons are pretextual. In other words, a lie. A deliberate mistruth. Plaintiff's cat's paw theory of liability fails in many respects, including her failure to establish that her preceptors harbored a discriminatory animus based upon Ms. Bragg's race. And retaliation. And the issue of retaliation, looking at the but-for standard of causation, we do not find, we do not believe there's a causal link between these alleged protected activities and the ultimate decision to terminate. The legitimate, non-discriminatory reasons for termination have been clearly set out. Plaintiff also fails to refute the independent honest belief that plaintiff failed to successfully complete her orientation. The orientation progress meetings are numerous. Plaintiff would assert in conclusion, defendant would assert that her summary judgment should be reaffirmed in all respects. Thank you very much, Mr. Dodry. Anything further, Ms. Stauf? Just to respond to a few factual points. The first thing Mr. Dodry indicated was that the preceptor was the first preceptor was changed out because she was getting married. That's not what it is at all. In fact, it was stress over planning the wedding that was blamed for the screaming in front of the patient. That's the role of the wedding. One of the key phrases that Mr. Dodry said up here is if you believe her in rattling off these things that we say that Ms. Bragg says that happened. And that is exactly why this case should not have been decided on because there are so many of these pieces that hinge on do we believe her. And in that case, we need a trial. Ms. Bragg was not given the choice about the transfer at Hartsfield Village. This was a short meeting. You are being transferred, here you go. No explanation, no nothing. This was not a option. Also, they waived the six month employment requirement that they normally have for employees to transfer between facilities which is part of our argument that how bad could she be? This is health care, my goodness. How terrible was she as an RN if they would waive this to move her over there? And let's see, I think I had one other thing for you all, but I can't find it. Thank you very much. Alright, thank you very much. Thanks to both counsel. We will take the case under advisement.